OPINION
{¶ 1} Leroy Newsome appeals from his conviction in the Greene County Common Pleas Court of possession of crack cocaine pursuant to his no contest plea. In a single assignment of error, Newsome contends the trial court erred in overruling his motion to suppress the cocaine recovered by police incident to his arrest for disorderly conduct.
 {¶ 2} Officer Richard Topiah of the Beavercreek Police Department responded at 8:38 a.m. on May 15, 2002 on the report of a person passed out behind the wheel of his vehicle in the Meijer's parking lot on Colonel Glen Highway. Topiah arrived at the parking lot shortly thereafter and observed Newsome slumped over the steering wheel of a vehicle. Topiah recorded the vehicle license number for the dispatcher and then photographed the defendant in the position he observed him.
 {¶ 3} Topiah then testified at the suppression hearing as follows:
 {¶ 4} "A. I went back up to the vehicle, I knocked on the window to get the driver awake. He did not respond. I then opened the door. The window was, was down approximately half way. After knocking on that a couple times with no response, I opened the door. Probably uttered `hey man, hey, hey', no response again. At that time I went ahead and shook his shoulder a couple times until he awoke.
 {¶ 5} "Q. Did you notice anything when he woke up?
 {¶ 6} "A. He was definitely confused, had to look around a little bit to find out where he was at. He mumbled a few things to me I really couldn't understand at that time, definitely glassy, blood shot eyes.
 {¶ 7} "Q. Once you woke him up, what did you proceed to do then?
 {¶ 8} "A. I asked if he was okay, do you know where you're at, what is your name. He did tell me his name, he said that he was sleeping because he had an altercation with his girlfriend.
 {¶ 9} "Q. Do you recall what happened after that?
 {¶ 10} "A. After a few more minutes of asking him, number one to make sure that he was all right, if he had been drinking, with my experience he didn't seem like a normal person that was just asleep behind the wheel.
 {¶ 11} "Q. Do you often encounter individuals that are sleeping in their cars in your experience?
 {¶ 12} "A. Quite frequently, yes, I do.
 {¶ 13} "Q. Did you at any point ask him to get out of the vehicle?
 {¶ 14} "A. Yes, I did.
 {¶ 15} "Q. You asked him?
 {¶ 16} "A. Yes.
 {¶ 17} "Q . What did he do upon you asking him?
 {¶ 18} "A. He voluntarily got out of the vehicle, I believe we walked a couple steps back towards the rear of the car, I wanted to see how steady he was on his feet to see if he was falling or staggering and to further investigate whether or not he was under the influence of alcohol and/or drugs.
 {¶ 19} "Q. Was he in custody at all at that point?
 {¶ 20} "A. Absolutely not.
 {¶ 21} "Q. Do you recall when Officer Curd arrived on the scene?
 {¶ 22} "A. We were out of the car approximately 30 seconds when Officer Curd arrived.
 {¶ 23} "Q. And from there what did you do?
 {¶ 24} "A. I stood back, I was — even though I was the first Officer on the scene I was originally sent as backup Officer, Officer Curd then began asking questions, pretty much the same thing I already asked him. And at that time he determined that in Mr. Newson's [sic] state he was unable to care for himself. We felt that, you know, he would be a danger to himself or someone else if we let him continue. At that point he was placed in custody by Officer Curd and read his Miranda Rights.
 {¶ 25} "Q. Did he say anything after you had Mirandized him that you recall?
 {¶ 26} "A. Not that I recall, other than the reason why he was there is that he had a fight with his girlfriend."
 {¶ 27} Topiah testified that while they were placing Newsome under arrest, one of the Meijer's loss prevention officers told him that he saw a crack pipe laying in the front seat underneath what would have been Newsome's right leg. Topiah said he also saw the pipe and photographed it in the position described by the loss prevention officer.
 {¶ 28} On cross-examination, Topiah acknowledged that it is not uncommon for a person in a shopping parking lot to be asleep. He also conceded that glassy and bloodshot eyes are also consistent with the appearance of someone just waking from a sleep. He also conceded he did not smell any alcohol on the defendant.
 {¶ 29} Officer Rodney Curd testified he responded on the dispatch that someone was passed out in a vehicle in Meijer's parking lot. He testified that when he arrived the defendant was out of his vehicle and was being questioned by Officer Topiah. Curd said the defendant was "kind of mush-mouth, eyes were glassy, very unsteady on his feet." (Tr. 33). Curd said he could tell the defendant was under the influence of something, probably some drug, since he smelled no alcohol on the defendant. Curd testified he has had experience encountering people who are under the influence of drugs. (Tr. 33). He explained why he arrested the defendant as follows:
 {¶ 30} "A. He was unable to care for himself. As I was saying, the obvious signs of being under the influence of some drug. I felt he was unable to care for himself. I couldn't very well leave him in the car. And he had been passed out prior to my arrival. So that's the reason." (Tr. 37).
 {¶ 31} On cross-examination, Curd was asked if the defendant's demeanor wasn't consistent with just being sleepy. Curd responded:
 {¶ 32} "A. Not necessarily. I believe we talked to him long enough. I can discount that totally. Someone that has been asleep has been like — I experience generally within a couple of minutes they'll start making a little better sense than, you know, what he was. I don't believe that is because he was asleep.
 {¶ 33} "Q. However, my question is those are signs also of someone who has been asleep, correct; mush-mouthed, glassy eyes, blood shot eyes, those are signs that you might encounter from someone who has been sleeping?
 {¶ 34} "A. Could be. Yes, sir."
 {¶ 35} Curd testified that at times the defendant was almost talking to himself, not making any sense. Curd said the defendant continued to talk to himself even after he was arrested and placed in the police cruiser. (Tr. 41).
 {¶ 36} In overruling Newsome's suppression motion, the trial court found that Officer Topiah acted reasonably in checking upon the condition of Newsome who he observed sleeping behind the wheel of the vehicle. The trial court noted that Newsome was charged with disorderly conduct although there was no evidence that Newsome was "unruly." The court found however that the discovery of the crack pipe was not a result of this "questionable arrest" but was the result of the loss prevention officer's observing the pipe and informing the officers of its existence. The court found that the pipe was observed in plain view and was not the fruit of an illegal arrest and search.
 {¶ 37} In a single assignment of error, Newsome contends the trial court erred in not granting his suppression motion.
 {¶ 38} Appellant argues that the trial court should have suppressed the cocaine because the police did not have articulable suspicion to stop him and detain him because he was violating no law by sleeping in his car. Newsome also argues there is no evidence to support a public safety justification for the officers' conduct. Newsome also argues that the police did not have probable cause to arrest him for the minor misdemeanor of disorderly conduct because he was not disorderly and he did not require medical care or was unable to provide for his own safety and his arrest for disorderly conduct was not appropriate.
 {¶ 39} The State argues that Officer Topiah did not have to have reasonable suspicion that the defendant was engaged in criminal activity in order to investigate the defendant's conduct. The State argues that Officer Topiah acted reasonably in investigating whether the defendant was in need of assistance. The State also argues that Officer Topiah had probable cause to believe that the defendant was under the influence of drugs and was thus unable to provide for his own safety.
 {¶ 40} We agree with the State that Officer Topiah acted reasonably in checking into the condition of the defendant. When Topiah was unable to initially arouse the defendant, and the defendant appeared confused, it was not unreasonable to ask the defendant to exit the vehicle. When both officers determined that in light of their experience Newsome was something more than sleepy, but probably under the influence of drugs, it was appropriate to arrest him for disorderly conduct. Both officers testified that Newsome represented a danger to himself or others behind the wheel of the vehicle.
 {¶ 41} R.C. 2917.11(A) provides that no person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following . . . (5) creating a condition that presents a risk of physical harm to persons or property, by any act which serves no lawful and reasonable purpose of the offender.
 {¶ 42} Both officers had probable cause to believe Newsome's condition presented a risk of physical harm to himself or others as he sat behind the wheel of his vehicle. Except as provided in R.C.2917.11(E)(3), disorderly conduct is a minor misdemeanor and an arrest is normally inappropriate. R.C. 2935.26 provides that an officer may arrest a person for a minor misdemeanor if the offender requires medical care or is unable to provide for his own safety.
 {¶ 43} In State v. Tillman (Sept. 30, 1993), Montgomery App. No. 14060, we upheld a search conducted by police incident to the arrest of an apparently intoxicated person for disorderly conduct pursuant to R.C.2917.11(B)(2). Judge Fain wrote as follows:
 {¶ 44} "In the case before us, Tillman was sound asleep, apparently intoxicated, behind the wheel of a car which appeared to be operable. We conclude that the Parks and Loraine cases are distinguishable. By being behind the wheel of an operable car, Tillman created a condition in which there was a significant risk that he would awaken, or be awakened by some external event, while still intoxicated, and drive the car, perhaps not even mindful of being in an intoxicated state. We conclude that this constituted a risk of physical harm to Tillman, himself, or to another, or to the property of another, within the proscription of R.C.2917.11(B)(2)."
 {¶ 45} The trial court found the crack pipe should not be suppressed because a private citizen observed the crack pipe. The record, however, indicates the pipe was discovered and removed after Newsome was no longer free to go. (Tr. 53). Officer Curd testified that Newsome was free to go until the point of his arrest. (Tr. 49). In short, the record simply does not clearly demonstrate that the pipe was discovered before Newsome was arrested. Because we find that Newsome's arrest for disorderly conduct was proper, the incident search of the vehicle was reasonable as well. State v. Murrell (2002), 94 Ohio St.3d 489,2002-Ohio-1483.
 {¶ 46} The judgment of the trial court is Affirmed.
Fain, P.J., and Grady, J., concur.